### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| JOSHUA CLARK, individually and on behalf of all others similarly situated,<br><br>      Plaintiff,<br><br>v.<br><br>CERNER CORPORATION, COMPENSATION COMMITTEE OF THE CERNER CORPORATION BOARD OF DIRECTORS, and CERNER CORPORATION FOUNDATIONS RETIREMENT PLAN ADMINISTRATIVE AND INVESTMENT COMMITTEE,<br><br>      Defendants. | Case No. 2:20-cv-2195<br><br><br>**CLASS ACTION COMPLAINT** |

## INTRODUCTION

Plaintiff Joshua Clark ("Plaintiff"), individually and on behalf of the Cerner Corporation Foundations Retirement Plan (the "Cerner Plan") and a class of similarly situated participants in and beneficiaries of the Cerner Plan, brings this class action pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Cerner Plan's fiduciaries, including Cerner Corporation ("Cerner"), the Compensation Committee of the Cerner Corporation Board of Directors ("Compensation Committee"), and the Cerner Corporation Foundations Retirement Plan Administrative and Investment Committee ("Administrative Committee") for breaches of their fiduciary duties. Plaintiff brings this action by and through his undersigned attorneys based upon personal knowledge; information contained in the Cerner Plan's Summary Plan Description ("SPD"), Investment Policy Statement ("IPS"), and Trust Agreement; the Cerner Plan's publicly-available Form 5500 series filings with the United States Department of Labor; the account information and statements provided to him as a participant in the Cerner Plan; and other information publicly available or obtained through counsel's investigation. Plaintiff anticipates that discovery will uncover further support for the

allegations in this Complaint and, potentially, for additional claims. As described herein, Defendants have breached their fiduciary duties to the Cerner Plan in violation of ERISA, to the detriment of the Cerner Plan and its participants and beneficiaries. Plaintiff brings this action to remedy this unlawful conduct, prevent further mismanagement of the Cerner Plan, and obtain equitable and other relief as provided by ERISA. Plaintiff brings this action and request this relief for the benefit of the Cerner Plan and its participants and beneficiaries.

**Upon information and belief, Plaintiff never signed any arbitration agreement with any of Defendants, including in particular the arbitration agreement upon which Defendants have relied in their recently filed Motion to Dismiss in *Freck et al v. Cerner Corporation et al*, Case No. 4:20-cv-00043-BCW, pending in the United States District Court for the Western District of Missouri.**

In support of his claims, Plaintiff states and alleges as follows:

## NATURE OF THE ACTION

1.      This is a civil enforcement action under ERISA sections 1132(a)(2) and (3), brought on behalf of the Cerner Plan.

2.      This class action concerns the Cerner Plan and is brought on behalf of all participants in and beneficiaries of the Cerner Plan during the six-year period of April 14, 2014 through the present (the "Class Period").

3.      All the Defendants were fiduciaries of the Cerner Plan during the Class Period.  Cerner, the Administrative Committee, and the individual Administrative Committee members were responsible for selecting, monitoring, and removing investment options made available to the Cerner Plan participants, as well as controlling and accounting for expenses of the Cerner Plan, and, upon information and belief, the Compensation Committee appointed the members of the Administrative Committee.

4.     The fiduciary obligations of plan fiduciaries to the participants and beneficiaries of an ERISA-governed plan are "the highest known to the law." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598, 602 (8th Cir. 2009).

5.     Fiduciaries must act "solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1).

6.     When selecting investment options for an ERISA-governed plan, the plan's fiduciaries are required to act for the exclusive benefit of the plan and its participants and beneficiaries, perform with undivided loyalty, act prudently, defray reasonable plan expenses, diversify investments to minimize large losses unless clearly prudent not to do so, and discharge their duties in accordance with the governing documents and instruments so long as they are consistent with ERISA.  ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

7.     Defendants failed to observe these duties.

8.     During the Class Period, Defendants could have leveraged the Cerner Plan's assets to qualify for lower-cost versions of the same investments, chosen less costly and equally or better-performing investment options for the Cerner Plan, and used the Cerner Plan's size to reduce recordkeeping fees.

9.     Also, during the Class Period, Defendants continuously designated Cerner stock (an undiversified investment) as the default investment option for the employer portion of contributions instead of well-diversified options, even though Cerner's stock performed poorly in comparison to its benchmark, thereby imposing more risk and risk-concentration on participants – something that was Cerner's interests but not in the interest of the participants.

10.      Plaintiff brings this action to remedy the losses the Cerner Plan has sustained as a result of these and other fiduciary breaches by Defendants and to obtain such further equitable or remedial relief as may be appropriate to redress and to enforce the provisions of Title I of ERISA.

11.      Plaintiff did not have knowledge of all material facts (including, among other things, the investment alternatives that are comparable to the investments offered within the Cerner Plan, comparisons of the costs and investment performance of Cerner Plan investments versus available alternatives within similarly-sized Cerner Plans, total cost comparisons to similarly-sized Cerner Plans, information regarding other available share classes, and information regarding the availability and pricing of separate accounts and collective trusts and market-rate recordkeeping costs) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed. Further, Plaintiff did not have and does not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Cerner Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing Cerner Plan investments, because this information is solely within the possession of Defendants prior to discovery. Having never managed a large 401(k) Cerner Plan such as the Cerner Plan, Plaintiff lacked actual knowledge of reasonable fee levels and prudent alternatives available to such Cerner Plans. Plaintiff did not and could not review the Committee meeting minutes or other evidence of Defendants' fiduciary decision making, or the lack thereof.  This Complaint is based upon reasonable inferences drawn from the facts set forth herein.

## THE PARTIES

12.      Plaintiff Joshua Clark is a resident of Olathe, Kansas and a former employee of Cerner who participated in the Cerner Plan during the Class Period, continues to participate in the Cerner Plan, and suffered harm as a result of Defendants' respective breaches of their fiduciary duties under, and

violations of, ERISA.

13.     Upon information and belief, Plaintiff never signed any arbitration agreement with any of the Defendants, including in particular the arbitration agreement upon which Defendants have relied in their recently filed Motion to Dismiss in *Freck et al v. Cerner Corporation et al*, Case No. 4:20-cv-00043-BCW, pending in the United States District Court for the Western District of Missouri.

14.     Defendant Cerner is a Delaware corporation, registered to do business in Kansas, with its headquarters located in Kansas City, Missouri. Cerner has a significant presence in Kansas City, Kansas and the State of Kansas as well.

15.     All Defendants, Cerner, the Administrative Committee, and the Compensation Committee, may be served with process by certified mail to Cerner's registered agent, The Corporation Company, Inc., 112 SW 7th Street Suite 3C, Topeka, Kansas 66603.

16.     All Defendants are fiduciaries of the Cerner Plan under ERISA.

17.     ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

18.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions.

19.     Defendants were fiduciaries of the Cerner Plan because they were so named; they exercised authority or control respecting management or disposition of the Cerner Plan's assets; they exercised discretionary authority or discretionary control respecting management of the Cerner Plan; or they had discretionary authority or discretionary responsibility in the administration of the Cerner Plan.

20.     As a sponsor and administrator of the Cerner Plan, Cerner is a fiduciary of the Cerner Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A). Cerner had ultimate

authority, discretion, and control over the Cerner Plan and the power to appoint and delegate duties and responsibilities regarding the Cerner Plan, and Cerner designated Fidelity Management Trust Company ("Fidelity") as the Cerner Plan's recordkeeper.

21.     The Administrative Committee is also a fiduciary within the meaning of ERISA. The Administrative Committee was delegated control over the management of the Cerner Plan and its assets, including developing and executing the Cerner Plan's Investment Policy Statement and investment policies and objectives; selecting and regularly monitoring the investment options in the Cerner Plan, including but not limited to the performance and costs of those investment options and comparing them to other better-performing or less-costly alternatives; and choosing and overseeing the Cerner Plan's third-party administrator, custodian, trustee, recordkeeper, and other service providers, monitoring their compensation, and minimizing the costs of such third-party services.  As such, the Administrative Committee and its members are fiduciaries under ERISA.

22.     Upon information and belief, the Compensation Committee of Cerner's Board of Directors appointed the members of the Administrative Committee, had discretion and control over who served on the Administrative Committee, and had a duty to monitor the members of the Administrative Committee.  Accordingly, the Compensation Committee and its members are fiduciaries under ERISA.

23.     Upon information and belief, the Administrative Committee consisted of Cerner's Chief Financial Officer, Chief People Officer, Vice President of Benefits and Compensation, and another Cerner executive to be named by the other three members of the Committee.  Each of these persons who served on the Cerner Plan's Administrative Committee during the Class Period were fiduciaries of the Cerner Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).  Each member of the Administrative Committee during the Class Period is susceptible to being individually named as an individual defendant in this lawsuit, but Plaintiff has restrained from naming them individually at this

time in anticipation of the same stipulation being entered in this matter that was entered as Doc. 8 in *Freck et al v. Cerner Corporation et al*, Case No. 4:20-cv-00043-BCW, in the United States District Court for the Western District of Missouri.

24.     Upon information and belief, Linda Dillman, Julie Gerberding, George A. Riedel, Halsey Wise, and William Zollars were members of the Compensation Committee during the Class Period. Each of these members and any other yet-to-be-identified members of the Compensation Committee during the Class Period was a plan fiduciary under Section 3(21)(A), 29 U.S.C. § 1002(21)(A) of ERISA. Each member of the Compensation Committee during the Class Period is susceptible to being individually named as an individual defendant in this lawsuit, but Plaintiff has restrained from naming them individually at this time in anticipation of the same stipulation being entered in this matter that was entered as Doc. 8 in *Freck et al v. Cerner Corporation et al*, Case No. 4:20-cv-00043-BCW, in the United States District Court for the Western District of Missouri.

25.     For ease of reference, the Administrative Committee and its members during the Class Period are hereinafter referred to as the "Administrative Committee Defendants," and the Compensation Committee and its members during the Class Period and are hereinafter referred to as the "Compensation Committee Defendants."

## JURISDICTION AND VENUE

26.     **Subject Matter Jurisdiction.** This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA.

27.     **Personal Jurisdiction.** This Court has personal jurisdiction over Defendants because they reside or transact business in this District and/or have significant contacts with this District, and

because ERISA provides for nationwide service of process, ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), the Cerner Plan is and was administered in part in this District, and the breaches of ERISA took place in part in this District. This Court also has personal jurisdiction over Defendants pursuant to Fed. R Civ. P. 4(k)(1)(A) because they would be subject to the jurisdiction of a court of general jurisdiction in Kansas.

28.     **Venue.**  Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Cerner Plan was administered in part in this District, some or all of the violations of ERISA occurred in this District, and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## ERISA'S FIDUCIARY STANDARDS

29.     To safeguard plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty, prudence, diversification, and compliance with the plan document upon employers and other plan fiduciaries. 29 U.S.C. § 1104(a)(1).  These fiduciary duties apply to Defendants because they are fiduciaries of the Cerner Plan.

30.     ERISA § 404(a)(1), 29 U.S.C.§ 1104(a)(1), imposes a "prudent man standard of care" on plan fiduciaries:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and —
>
>> (A)     for the exclusive purpose of:
>>
>>> (i)     providing benefits to participants and their beneficiaries; and
>>>
>>> (ii)     defraying reasonable expenses of administering the plan;
>>
>> (B)     with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims;

(C)      by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

(D)      in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and title IV.

31.      ERISA also imposes co-fiduciary duties on plan fiduciaries.  ERISA § 405, 29 U.S.C. § 1105, states in relevant part that:

In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1)      if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

(2)      if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3)      if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

32.      Under ERISA, fiduciaries who exercise discretionary authority or control over the selection of plan investments must act prudently and solely in the interest of participants and beneficiaries of the plan.  Thus, "the duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties." *In re Unisys Savings  401(k) Plan Litig.*, 74 F.3d 420, 435 (3d Cir. 1996).  As the Department of Labor explains,

[T]o act prudently, a plan fiduciary must consider, among other factors, the availability, riskiness, and potential return of alternative investments for his or her plan. [Where an investment], if implemented, causes the plan to forego other investment opportunities, such investments would not be prudent if they provided a plan with less return, in comparison to risk, than comparable investments available to the plan, or if they involved a greater risk to the security of plan assets than other investments offering a similar return.

DOL Opinion 88-16A (1988).

33.      A fiduciary's duty of loyalty requires a fiduciary to act solely in the interest of plan participants and beneficiaries. As the Department of Labor has warned:

[T]he Department has construed the requirements that a fiduciary act solely in the interest of, and for the exclusive purpose of providing benefits to participants and beneficiaries, as prohibiting a fiduciary from subordinating the interests of participants and beneficiaries in their retirement income to unrelated objectives. In other words, in deciding whether and to what extent to invest in a particular investment, or to make a particular fund available as a designated investment alternative, a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income. A decision to make an investment, or to designate an investment alternative, may not be influenced by non-economic factors unless the investment ultimately chosen for the plan, when judged solely on the basis of its economic value, would be equal to or superior to alternative available investments.

DOL Opinion 98-04A (1998); *see also* DOL Opinion 88-16A (1988).

34.     In a separate publication, the Department of Labor writes:

The Federal law governing private-sector plan, the Employee Retirement Income Security Act (ERISA), requires that those responsible for managing a plan -- referred to as fiduciaries -- carry out their responsibilities prudently and solely in the interest of the plan's participants and beneficiaries. Among other duties, fiduciaries have a responsibility to ensure that the services provided to their plan are necessary and that the cost of those services is reasonable.

* * *

Plan fees and expenses are important considerations for all types of plans. As a plan fiduciary, you have an obligation under ERISA to prudently select and monitor plan investments, investment options made available to the plan's participants and beneficiaries, and the persons providing services to your plan. Understanding and evaluating plan fees and expenses associated with plan investments, investment options, and services are an important part of a fiduciary's responsibility. This responsibility is ongoing. After careful evaluation during the initial selection, you will want to monitor plan fees and expenses to determine whether they continue to be reasonable in light of the services provided.

* * *

By far the largest component of plan fees and expenses is associated with managing plan investments. Fees for investment management and other related services generally are assessed as a percentage of assets invested. Employers should pay attention to these fees. They are paid in the form of an indirect charge against the participant's account or the plan because they are deducted directly from investment returns. Net total return is the return after these fees have been deducted. For this reason, these fees, which are not specifically identified on statements of investments, may not be immediately apparent to employers.

*Understanding Plan Fees and Expenses*, U.S. Dep't of Labor Employee Benefits  Security Admin. (Dec. 2011), http://www.dol.gov/ebsa/publications/undrstndgrtrmnt.html.

## GENERAL ALLEGATIONS

35.     The Cerner Plan is a "defined contribution" plan under ERISA, a type of retirement plan in which the employer, employee, or both make contributions on a regular basis, individual accounts are set up for participants, and benefits are based on the amounts credited to these accounts (through employee contributions and, if applicable, employer contributions), plus any investment earnings on the money in the account.

36.     Contributions to the Cerner Plan are made in the form of salary deferral contributions by individual employee participants, through Cerner in the form of employer matching contributions, and through profit sharing contributions.

37.     Regarding Cerner's employer matching contributions, Cerner matches 33% of each participant's deferral contribution, up to certain limits, but it makes those contributions exclusively in the form of Cerner common stock.

38.     Participants' contributions vest after one year of service and 20% for each additional year of service until a participant is 100% vested upon completing five years of service. Participants become fully vested in their account balance upon reaching normal retirement age (55), permanent disability, or death.

39.     Defendants selected and retained various investment options made available to participants in the Cerner Plan and chose the recordkeeper for the Cerner Plan.

40.     Defendants adopted an Investment Policy Statement for the Cerner Plan, and, pursuant to 29 U.S.C.§ 1104(a)(1)(D),   were required to "discharge [their] duties" "in accordance with th[is]

document[] … governing the plan insofar as such document[] … [is] consistent with the provisions of" ERISA.

41.     At the choice and discretion of the Administrative Committee, various investment options are made available to participants in the Cerner Plan.

42.     During 2018, for example, the Cerner Plan included 25 investment options, including 22 mutual funds valued in the aggregate at over a billion dollars, one collective investment trust fund, a stable value fund, the Cerner Common Stock fund, and a self-directed brokerage account.

43.     From 2014 to 2017, the Cerner Plan's assets under management ranged from $1.7 billion to over $2 billion.

44.     As of December 2018, there was $2,100,950,189 in the Cerner Plan. *See* 2018 Form 5500, Schedule H, Part 1, Line l.

45.     Whether measured by assets or participants, the Cerner Plan is in the largest 0.1% of all 401(k) plans in the United States.  The 598 401(k) plans with over $1 billion (such as the Cerner Plan) are in the top 0.1% largest plans in the United States as measured by assets.  Likewise, the 801 401(k) plans with over 10,000 participants (sch as the Cerner Plan) are in the top 0.1% largest plans in the United States as measured by participants. *See The BrightScope/ICI Defined Contribution Plan Profile:  A Close Look at 401(k) Plans*, *2016*, 7 (June 2019),  https://www.ici.org/pdf/19_ppr_dcplan_profile_401k.pdf.

46.     Because the Cerner Plan is so large – one the largest plans in the entire country – the Administrative Committee for the Cerner Plan had the ability to choose investment options not generally available and had enormous bargaining power with respect to the fees and expenses that were charged against participants' investments and the fees and expenses charged for recordkeeping services.

47.     As shown below, however, Defendants did not take advantage of this enormous bargaining power, nor did they take appropriate actions to reduce the Cerner Plan's investment and

recordkeeping expenses or exercise appropriate judgment to scrutinize each investment option that was offered in the Cerner Plan to ensure it was prudent.

## Defendants Selected and Retained
## Cerner Company Stock as the Employer Match Contribution

48.     As noted above, 29 U.S.C. § 1104(a)(1) imposes a "prudent man standard of care" and duty of loyalty on Defendants that required them to discharge their duties "solely in the interest of the participants and beneficiaries," not in the interests of Cerner itself, and to "diversify[] the investments of the plan so as to minimize the risk" to Cerner Plan participants.

49.     During the entire Class Period, Defendants selected and retained Cerner company stock as the default investment option for the employer portion or "matching contribution" by Cerner. 2019 SPD, at p. 17 ("Cerner will make employer contributions (such as matching contributions) in common stock of Cerner Corporation.").

50.     This choice resulted in an enormous concentration of Cerner Plan assets in Cerner company stock.

51.     During that same Class Period, Cerner's stock performed poorly in comparison to its benchmark and the panoply of other well-diversified investment options that Defendants could have been chosen as the company match.

52.     Cerner's stock, according to the June 10, 2019 Required Disclosure Information for the Cerner Foundations Retirement Cerner Plan, is compared to the benchmark of the S&P 500, an index of five hundred large company stocks.

53.     According to Morningstar, Cerner's stock, a nondiversified investment in a single company, **advanced 11.98%** between March 31, 2014 and March 31, 2020.

54.     By comparison, the Fidelity 500 Index Fund, a far less risky, low cost, and heavily diversified investment in five hundred different companies, advanced **over 56%** during the same time period -- more than triple the return of Cerner's stock.

55.     This means that if a participant had $10,000 on March 31, 2014 in Cerner stock, the participant would have had **$11,198.22** on March 31, 2020 (excluding any transaction fees). Alternatively, if the participant had $10,000 in March 31, 2014 in Fidelity's S & P 500 Fund (FXAIX), the participant would have had **$15,601.29** as of March 31, 2020.

56.     Defendants' choice to use Cerner stock as the company match contribution during the Class Period was an action that put the interests of Cerner ahead of the interests of the Cerner Plan participants and was not in the sole interests of the participants.

57.     Using Cerner stock as the company match contribution was in Cerner's interests. It buoyed Cerner's stock price, provided capital to Cerner, and helped Cerner preserve cash, while making tax deductible contributions to the Cerner Plan. "By making contributions in employer stock to their retirement plans, companies are obviously trying to conserve the cash on their balance sheets."  See "Having Too Much employer stock in your 401(k) is dangerous.  Just look at GE." By Robert C. Pozen and Ming Liu (July 2, 2018), available at https://www.brookings.edu/opinions/having-too-much-employer-stock-in-your-401k-is-dangerous-just-look-at-ge/. By making employer contributions (such as matching contributions) in common stock of Cerner Corporation, Cerner directly benefits by not having to use cash to make those contributions.  *See* 2019 SPD at p.17; *see also*  Robert C. Pozen & Ming Liu, *Having Too Much Employer Stock in Your 401(k) is Dangerous. Just Look at GE*, Brookings (July 2, 2018) [hereinafter *Just Look*], https://www.brookings.edu/opinions/having-too-much-employer-stock-in-your-401k-is-dangerous-just-look-at-ge/.

58.    Using Cerner stock as the company match contribution was not in the sole interest of the Cerner Plan participants.  It exposed Cerner Plan participants to single stock risk, which many participants would not fully understand or appreciate.  "[I]n a careful study of plan participants, only one-third realized that their company stock is riskier than a diversified stock fund. Another study reached similar conclusions about the attitudes of plan participants toward employer stock even after they were educated about the benefits of diversification."  See *Just Look* (noting that in 2016 37% of the assets in Cerner's plan were invested in Cerner stock, substantially more than the roughly 10% average for publicly held companies and the 10% limit imposed by federal law on defined benefit plans.).  This can translate into a very significant reduction (potentially more than half) in the participant's retirement benefit.  *See* Shlomo Benartzi & Richard H. Thaler, *Heuristics and Biases in Retirement Savings Behavior*, 21 J. Economic Perspectives 81, 91 (Summer 2007), available at https://www.anderson.ucla.edu/documents/areas/fac/accounting/heuristics_biases.pdf.

59.    Although Cerner Plan participants are allowed to sell Cerner company stock and redirect the proceeds, the well-known tenets of behavioral finance made it a virtual certainty that the vast majority of stock contributed by Cerner would not be sold or changed by participants until some later life event, such as retirement or a change of employment. Behavioral finance research indicates that employees regard the employer's matching contribution in company stock as implicit advice, resulting in even more concentration in company stock.  "In particular, those who are required to take the employer match in the form of company stock allocate 29 percent of their discretionary contributions (that is, the money they have control over) to company stock, while those who have the option but not the requirement to take the employer match in the form of company stock allocate only 18 percent of their own funds to company stock."  *See supra* Benartzi & Thaler, at 90–91.

60.     Cerner appears to have established no specific limits on the amount of Company Stock a participant may own in a participant's Cerner Plan account.  *See* Trust Agreement at p. 10.

61.     Based on a study of their recordkeeping data as of June 2017, Vanguard found that out of 92 plan sponsors actively offering company stock, 6 out of 10 restricted participant contributions and/or exchanges into company stock.  *See* John A Lamancusa & Jean A. Young, Company Stock in DC Plans: A Decade Later, p. 10 (Dec. 2017), available at https://institutional.vanguard.com/iam/pdf/CIRCSP.pdf [hereinafter "Vanguard Stock in DC Plans"].

62.     Vanguard's study also found that between December 2005 and June 2017, 45% of company stock funds were closed to new money and/or eliminated from the plan.  *See* Vanguard Stock in DC Plans at p. 6.

63.     Morningstar has noted that fewer companies are even allowing employer stock (let alone making them the default matching contribution) in their defined contribution plans due to the risk involved with this type of investment.  "Whereas nearly half of employers offered company stock in their 401(k) plans a decade ago, either as part of the 401(k)-plan menu or as part of an employee stock-ownership plan, that figure had dropped to less than 40% as of 2016."  *See* Christine Benz, *Is It Ever a Good Idea to Hold Company Stock in a 401(k)?*, Morningstar (Sept. 5, 2019), https://www.morningstar.com/articles/919235/is-it-ever-a-good-idea-to-hold-company-stock-in-a-401k [hereinafter *Is it Ever a Good Idea*].

64.     During the Class Period for which there is publicly available information, at least 30% of the Cerner Plan's assets were invested in Cerner stock.

65.     This concentration of Cerner Plan assets in Cerner company stock created a significant single stock risk and exponential reduction in Cerner Plan participants' retirement funds, and it was caused by Defendants' putting Cerner's interests ahead of participants' interests and failure to monitor

16

and change the company match contribution from Cerner stock to a suitable and appropriate diversified investment option.

66.     "The relative value to the employee of a dollar of company stock, as opposed to a diversified stock portfolio, is inversely related to the proportion of wealth held in company stock, the number of years the stock will be held, and the volatility of the stock. For example, with an assumed investment horizon of ten years and 25 percent of the assets in company stock, a dollar in company stock only provides 58 percent as much risk-adjusted value as a diversified portfolio. Lengthening the investment horizon to 15 years, and increasing the allocation to company stock to 50 percent, would further reduce the value to 33 cents on the dollar. These results probably underestimate the costs of being under-diversified, because they ignore the positive correlation between human capital and the performance of company stock." *See supra* Benartzi & Thaler at 90–91.

67.     As David Blanchett, Morningstar's Head of Retirement Research puts it, even in the absence of extreme situations such as Enron and Lehman Brothers, the optimal allocation to stock, after considering its impact on portfolio diversification and human-capital considerations is, from a "pure research perspective" zero. *See Is it Ever a Good Idea*.

68.     The Cerner Plan's Investment Policy Statement ("IPS") clearly requires the Committee to "periodically evaluate the prudence of continuing to offer Cerner stock as an investment option under the Cerner Plan". *See* IPS at p. 7.

69.     Accordingly, Defendants' allowing Cerner company stock to remain the matching contribution and for the  Cerner Plan to continue to concentrate assets in Company stock throughout the Class Period while the Cerner stock significantly underperformed its well-diversified benchmark was not only a violation of Defendants' fiduciary duties to prudently monitor and change the investment options

in the Cerner Plan, but also inconsistent with the Cerner Plan's own Investment Policy Statement, in violation of 29 U.S.C. 1104(a)(1)(D).

70.     ERISA's mandate to these Defendants was to discharge their duties with respect to the Cerner Plan "solely" in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and by diversifying the investments in the Cerner Plan so as to minimize the risk of large losses, not to do what was in the best interests of Cerner.

71.     Defendants failed to discharge these duties and monitor the performance of the Cerner company stock relative to other investment options and to switch the employer matching contribution from Cerner company stock to a more suitable, diversified, and better-performing investment option.

## Defendants Failed to Investigate and Select Lower Cost Versions of the Same Investments as well as Lower Cost Alternative Funds

72.     As noted above, under 29 U.S.C. § 1104(a)(1), a plan fiduciary must provide diversified investment options for a defined-contribution plan while also giving substantial consideration to the cost of those options.

73.     In addition to the foregoing, the Cerner Plan's own Investment Policy Statement required the Defendant fiduciaries to perform an annual review of the expenses of each investment option. *See* Cerner Plan's IPS, at p. 7.

74.     As demonstrated below, Defendants failed to utilize the lowest cost share class for many of the mutual funds within the Cerner Plan, and failed to consider collective trusts, commingled accounts, or separate accounts as alternatives to the mutual funds in the Cerner Plan, despite their lower fees.

75.     At all times during the Class Period, Defendants knew or should have known of the existence of cheaper mutual fund share classes and collective investment trust investments and, therefore, also should have immediately identified the prudence of transferring the Cerner Plan's funds into these lower cost alternative investments.

76.     Defendants' mismanagement of the Cerner Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duties of prudence and loyalty and is inconsistent with the Cerner Plan's own Investment Policy Statement, in violation of 29 U.S.C. § 1104. Their actions were contrary to actions of a reasonable fiduciary and cost the Cerner Plan and its participants millions of dollars.

77.     "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA") § 7.

78.     The duty to evaluate and monitor fees and investment costs includes fees paid directly by plan participants to investment providers, usually in the form of an expense ratio or a percentage of assets under management within a particular investment. *See* Investment Company Institute ("ICI"), *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses*, *2018*, at 3–5 (July 2019), available at https://ici.org/pdf/per25-04.pdf .

79.     "Any costs not paid by the employer, which may include administrative, investment, legal, and compliance costs, effectively are paid by plan participants." *Id*. at 7.

80.     The fiduciary task of evaluating investments and investigating comparable alternatives in the marketplace is made much simpler by the advent of independent research from companies like Morningstar, which sorts investments of all kinds into categories based on the underlying securities in each portfolio.

81.     On average, there are lower expense ratios for 401(k) participants than those for other investors. *See id.* at 11-14.

82.     ERISA-mandated monitoring of investments leads prudent and impartial plan sponsors to continually evaluate performance and fees, resulting in great competition among investment providers in the marketplace. *See id* at 11.

83.     Furthermore, the large asset balances of 401(k) plans, especially the largest ones as measured by assets managed, lead to economies of scale and special pricing within mutual funds and other investment products. *See id*.

84.     This has led to falling mutual fund expense ratios for 401(k) plan participants since 2000. In fact, these expense ratios fell 47 percent from 2000 to 2018 for equity funds, 32 percent for hybrid funds, and 43 percent for bond funds. *See id*. at 1.

85.     In addition, and particularly relevant for Cerner's Plan, as 401(k) plan size increases, asset-weighted average expense ratios decrease dramatically from 0.86% at less than $1 million to 0.36% at more than $1 billion.  *See id.* at 16.

86.     The following chart published by the Investment Company Institute in July 2019 illustrates that 401(k) plans on average pay far lower fees than regular investors and that their expense ratios have continued to drop over the years, including during the Class Period. *Id*. at 12.



87.     Prudent and impartial plan sponsors should be monitoring both the performance and cost of the investments selected for the 401(k) plans, as well as investigating alternatives in the marketplace to ensure that well-performing, low cost investment options are being made available to plan participants.

88.     Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors. Generally, more expensive share classes are targeted at smaller investors with less bargaining power, while lower cost shares are targeted at "institutional investors" with more assets (generally, $1 million or more) and therefore greater bargaining power.

89.     Typically, there is no difference between share classes other than cost – i.e., the funds hold identical investments and have the same manager.

90.     Large defined contribution plans such as the Cerner Plan, with more than $1 billion in assets, easily qualify for these lowest-cost share classes.

91.     Prudent retirement plan fiduciaries will search for and select the lowest-priced share class available.

92.     As one well-regarded ERISA attorney put it, "The fiduciaries also must consider the size and purchasing power of their plan and select the share classes (or alternative investments) that a fiduciary who is knowledgeable about such matters would select under the circumstances.  In other words, the 'prevailing circumstances' – such as the size of the plan – are a part of a prudent decision-making process. The failure to understand the concepts and to know about the alternatives could be a costly fiduciary breach." Fred Reish, *Just Out of Reish: Classifying Mutual Funds*, PLAN SPONSOR (Jan. 2011) available at http://www.plansponsor.com/MagazineArticle.aspx?id=6442476537.

93.     Importantly, any reasonable, prudent fiduciary should immediately know that an institutional class share is a preferable and less-expensive alternative to an investor class share and would have no reason not to immediately switch to that less-expensive alternative. *Braden*, 588 F.3d at 596 (finding inference of flawed review process where specific identical institutional shares were available). "**Because the institutional share classes are otherwise identical to the retail share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary**." *Tibble v. Edison*

*Int'l*, 2017 U.S. Dist. LEXIS 130806, at *40 (C.D. Cal. Aug. 16, 2017). "**[A] fiduciary would have no reason not to switch to an identical share class fund**." *Cunningham v. Cornell Univ.*, 2019 U.S. Dist. LEXIS 167868, at *53 (S.D.N.Y. Sept. 27, 2019).

94.     Plan fiduciaries such as Defendants here must be continually mindful of investment options to ensure they do not unduly risk plan participants' savings and charge unreasonable fees.

95.     Like mutual funds, collective trust funds pool plan participants' investments, but can provide an even lower fee alternative compared to institutional and 401(k) share classes of mutual funds.

96.     Collective trusts are administered by banks or trust companies, which assemble a mix of assets such as stocks, bonds and cash.

97.     Regulated by the Office of the Comptroller of the Currency rather than the Securities and Exchange Commission, collective trusts have simple disclosure requirements, and cannot advertise nor issue formal prospectuses. As a result, their costs are much lower, with less or no administrative costs, and less or no marketing or advertising costs.  Collective trust funds have been used for decades by retirement plans, gained widespread adoption in defined benefit plans as early as the 1950s, and as of 2017 were the fastest growing vehicle within 401(k) plans.  *See* Erach Desai & Jason Dauwen, Collective Investment Trusts—A Perfect Storm, 3, 5 (March 2017), available at https://www.ctfcoalition.com/portalresource/AM-WP-CollectiveInvestmentTrustsAPerfectStorm-030317.pdf.

98.     Due to their potential to reduce overall plan costs, collective trusts are becoming increasingly popular.  *See supra Use of CITs in DC Plans Booming, Paula Aven Gladyc*; *CITs Gaining Ground in 401(k) Plans*, EMPLOYEE BENEFIT NEWS (Apr. 14, 2016), available at http://www.benefitnews.com/news/cits-gaining-ground-in-401-k-plans  [hereinafter *CITs Gaining Ground*].  Indeed, as of 2016, among plans over $1 billion in size, more assets were held in collective

trusts (43%) than in mutual funds (only 25%). *See* Investment Company Institute, *The Brightscope/ICI Defined Contribution Plan Profile: A Close Look at 401(k)Plans, 2016*, 35 (June 2019), https://www.ici.org/pdf/19_ppr_dcplan_profile_401k.pdf.

99.     Collective trusts use a unitized structure and the units are valued daily; as a result, participants invested in collective trusts can track the daily performance of their investments online. *Use of CITs in DC Plans Booming*; *CITs Gaining Ground* .

100.     Many if not most mutual fund strategies are available in collective trust format, and the investments in the collective trusts are identical to those held by the mutual fund. *Id.*

101.     In fact, as Joseph F. Martel, a multi asset portfolio specialist for T. Rowe Price has publicly stated, the T. Rowe Price Retirement Trusts collective trust has "'the same portfolio management team, glidepath, subasset-class exposure, tactical allocation overlay and underlying investments' as the mutual fund-based T. Rowe Price Retirement Funds target-date series ."  *See* CIT Target-Date Assets Surging As Mutual Funds Hit By Outflows, Pensions & Investments (June 24, 2019).  Mr. Martel went on to explain that, depending upon various factors such as total assets, the collective investment trust pricing can be as low as 32 basis points across all years while fees for the comparable mutual fund-based series run 38 to 59 basis points depending upon the target date years.  See *id*.

102.     Collective trusts contract directly with the plan, and provide regular reports regarding costs and investment holdings, thus the Plan has the same level of protection that the Investment Company Act provides to individual investors, eliminating the need for the protections of the Investment Company Act.

103.     Collective trusts are still subject to state and federal banking regulations that provide comparable protections.

104.    Thus, a prudent fiduciary managing a large plan will give serious consideration to the use of separate accounts or collective trusts, and in the majority of cases, will opt to move out of mutual funds.

105.    As demonstrated by the charts below, in several instances during the Class Period, Defendants failed to prudently monitor the Cerner Plan to determine whether the Cerner Plan was invested in the lowest-cost share class and/or collective trusts available for the Cerner Plan's mutual funds, which are identical to the mutual funds in the Cerner Plan in every way except for their lower cost, and to immediately switch to these lower cost alternatives.

106.    In simple terms, Defendants failed to consider switching to an investment option that was the same investment in a "different wrapper" at a lower price.

107.    For example, during the Class Period several funds in the Cerner Plan had identical lower share counterparts that were never selected by the Cerner Plan's fiduciaries. The chart below uses 2019 expense ratios, the most recent data available, to demonstrate how much more expensive the funds were than their identical, lower-cost counterparts:

| Fund In Cerner Plan | 2019 Expense Ratio | Lower Cost Share Class | 2019 Expense Ratio | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| TWUIX American Century Ultra Fund Inv Class | 0.78 % | AULDX American Century Ultra Fund R6 Class | 0.62 % | Domestic Equity | 26% |
| FXAIX Fidelity 500 Index Fund | 0.015% | VFFSX Vanguard 500 Index Fund | 0.01% | Domestic Equity | 50% |

| AADEX<br><br>American Beacon Large Cap Value Fund Institutional Class | 0.62 % | AALRX<br>American Beacon Large Cap Value Fund R6 Class | 0.58 % | Domestic Equity | 7% |
|---|---|---|---|---|---|
| WATFX<br><br>Western Asset Core Bond Fund Class I | 0.45% | WACSX<br><br>Wester Asset Core Bond Fund Class IS | 0.42% | Bond Fund | 7% |

108.    Defendants also included investor-share-class T. Rowe Price target date mutual funds, even though the Cerner Plan was eligible for far less costly collective investment trust or "CIT" versions of these same investments.

109.    According to data compiled by Morningstar, both T. Rowe Price and Fidelity each saw mutual fund target-date fund assets decline between 2017 and 2018 while their collective investment trust target-date business grew.  *See* CIT Target-Date Assets Surging As Mutual Funds Hit By Outflows, Pensions & Investments (June 24, 2019).  T. Rowe Price specifically had net outflows of $23 billion in 2017 and 2018 from its target-date mutual funds and $21.4 billion of net inflows into its collective investment trust target date investments.  See *id*.

110.    From 2012 until now the Cerner Plan's fiduciaries could have offered the collective trust versions of the T.Rowe Price target date funds which were less expensive than the identical versions utilized by the Cerner Plan, but failed to do so.  Additionally, from 2015 (inception year of institutional shares of the T. Rowe Price target date funds), the Cerner Plan's fiduciaries should have used the institutional shares if less expensive.

111.    It is noteworthy that fiduciaries for the 401(k) Plans of other large, publicly traded

Kansas City area companies and employers were paying attention to these developments and responding to same.  For example, Garmin moved from T. Rowe Price mutual funds to T. Rowe Price collective investment trusts as early as 2014.  See Garmin International Form 5500 for the Garmin International, Inc. Retirement Plan (Year ending 12/31/2014), Independent Auditors' Report of Rubin Brown LLP, Note 5 at page 15.  At the time of this change, the Garmin plan was approximately half the size of the Cerner plan.

112.    The $1 billion Cerner Plan, with hundreds of millions of dollars in various investment options, easily qualified for these lower cost options.  Purchase and sale of the I-share class typically requires a mere $1 million minimum initial investment and there is no minimum for additional purchases, although the initial investment minimum generally is waived for financial intermediaries and retirement plans. *See, e.g.*, Prospectus dated 10/01/2019 for T. Rowe Price Retirement I 2005 Fund–I Class, at 26, https://prospectus-express.broadridge.com/summary.asp?doctype=pros&clientid=trowepll&fundid=872797105.

113.    Beginning in 2017, T. Rowe Price lowered the minimum amount for investing in target-date collective trust series to $20m in target-date assets. Prior to that the minimum amount needed to qualify for the target-date collective trust was $50m in target-date assets.  *See* CIT Target-Date Assets Surging as Mutual Funds Hit By Outflows, Pensions & Investments (June 24, 2019).

114.    At all times during the Class Period, the Cerner Plan had enough assets in each of the T.Rowe Price target-date mutual funds (except for T. Rowe Price Retirement 2060 (TRRLX) as of the end of 2015) to satisfy the minimum needed to qualify for I-share classes, and the Cerner Plan as a whole had more than $50 million in target-date assets, which would satisfy the minimum need to qualify for the collective investment trust target date fund.

115.    The following chart uses the most recent data available to demonstrate how much more

expensive the Cerner Plan's T. Rowe Price Target Date Funds were than their I-share/collective trust

equivalent counterparts:

| T. Rowe Price Target Date Fund in Cerner Plan | Expense Ratio[1] | T. Rowe Price Lower Cost Institutional Class/Collective Trust | Expense Ratio[2] | % Fee Excess |
|---|---|---|---|---|
| TRP RETIREMENT 2005 (TRRFX) | 0.53% | TRP RETIREMENT I 2005 (TRPFX) | 0.41% | 29% |
| | | TRP RETIREMENT TRUST B 2005 | 0.40% | 33% |
| TRP RETIREMENT 2010 (TRRAX) | 0.53% | TRP RETIREMENT I 2010 (TRPAX) | 0.40% | 33% |
| | | TRP RETIREMENT TRUST B 2010 | 0.40% | 33% |
| TRP RETIREMENT 2015 (TRRGX) | 0.56% | TRP RETIREMENT I 2015 (TRFGX) | 0.43% | 30% |
| | | TRP RETIREMENT TRUST B 2015 | 0.40% | 40% |
| TRP RETIREMENT 2020 (TRRBX) | 0.59% | TRP RETIREMENT I 2020 (TRBRX) | 0.46% | 28% |
| | | TRP RETIREMENT TRUST B 2020 | 0.40% | 48% |
| TRP RETIREMENT 2025 (TRRHX) | 0.63% | TRP RETIREMENT I 2025 (TRPHX) | 0.50% | 26% |
| | | TRP RETIREMENT TRUST B 2025 | 0.40% | 58% |
| TRP RETIREMENT 2030 (TRRCX) | 0.66% | TRP RETIREMENT I 2030 (TRPCX) | 0.53% | 25% |
| | | TRP RETIREMENT TRUST B 2030 | 0.40% | 65% |
| TRP RETIREMENT 2035 (TRRJX) | 0.68% | TRP RETIREMENT I 2035 (TRPJX) | 0.56% | 21% |
| | | TRP RETIREMENT TRUST B 2035 | 0.40% | 70% |

---

[1] https://www.troweprice.com/personal-investing/tools/fund-research/target-date-funds (accessed Apr. 12, 2020).
[2] I Shares data obtained from https://www.troweprice.com/personal-investing/tools/fund-research/target-date-funds (accessed Apr. 12, 2020); Collective trust data obtained from T Rowe Price Brochure containing data from July 2019.

| TRP RETIREMENT 2040 (TRRDX) | 0.70% | TRP RETIREMENT I 2040 (TRPDX) | 0.58% | 21% |
|---|---|---|---|---|
| | | TRP RETIREMENT TRUST B 2040 | 0.40% | 75% |
| TRP RETIREMENT 2045 (TRRKX) | 0.71% | TRP RETIREMENT I 2045 (TRPKX) | 0.59% | 20% |
| | | TRP RETIREMENT TRUST B 2045 | 0.40% | 78% |
| TRP RETIREMENT 2050 (TRRMX) | 0.71% | TRP RETIREMENT I 2050 (TRPMX) | 0.59% | 20% |
| | | TRP RETIREMENT TRUST B 2050 | 0.40% | 78% |
| TRP RETIREMENT 2055 (TRRNX) | 0.72% | TRP RETIREMENT I 2055 (TRPNX) | 0.59% | 22% |
| | | TRP RETIREMENT TRUST B 2055 | 0.40% | 80% |
| TRP RETIREMENT 2060 (TRRLX) | 0.72% | TRP RETIREMENT I 2060 (TRPLX) | 0.59% | 22% |
| | | TRP RETIREMENT TRUST B 2060 | 0.40% | 80% |

116.    A prudent fiduciary conducting an impartial review of the Cerner Plan's investments would have identified the cheaper share classes available and transferred the Cerner Plan's investments in the above-referenced funds into I shares or collective trusts at the earliest opportunity, especially given that the Cerner Plan's Investment Policy Statement explicitly permitted investing in these types of funds. Yet, despite the availability of lower-cost shares, Defendants did not transfer Cerner Plan holdings to any of these funds in breach of their fiduciary duties.

117.    In particular, if acting as prudent fiduciaries, Defendants should have realized that the T. Rowe Price Target Date Funds were using the T. Rowe Price Equity Index 500 fund, which charged an "outrageous" fee of up to 25 basis points, as Morningstar noted in its 2017 Target-Date Fund Landscape Report:

Target-date managers can better serve investors by using cheap options when selecting

underlying index funds. There are over 40 large-cap passive options used within target-date funds, ranging from large-value to equally weighted indexes, but most reside in the large-blend Morningstar Category and track the S&P 500. Despite near identical objectives, prices vary. Fees range from cheap—Schwab and State Street both charged 0.03% on their U.S. large-cap index offerings—to simply outrageous—MainStay offers its MainStay S&P 500 Index for 0.35% and T. Rowe Price charges 0.25% for T. Rowe Price Equity Index 500, which has $27 billion in assets.

*See* Morningstar 2017 Target-Date Fund Landscape Report (Apr. 21, 2017). Thus, the fiduciaries of a multi-billion retirement plan, who were supposed to look out for the participants, served up a target date fund that, for at least part of the Class Period, directed a substantial portion of the assets to a S & P 500 fund that appeared to charge more than seven times the market rate.

118. Considering well-known industry trends, publicly available information from sources such as Morningstar, the activities of other fiduciaries, and that Defendants were in charge of one of the largest defined contribution plans in the United States, Defendants were or should have been aware at all times during the Class Period of the benefits of these lower-cost alternative investment vehicles.

119. There is no good-faith explanation for utilizing high-cost share classes when lower-cost share classes are available for the exact same investment. The Cerner Plan did not receive any additional services or benefits based on its use of more expensive share classes. The only consequence was higher costs for Cerner Plan participants.

120. The Cerner Plan also incurred excess fees due to Defendants' failure to adequately investigate the availability of collective investment trusts and/or separate accounts in the same investment style of mutual funds in the Cerner Plan. Because of the Cerner Plan's size, it could have reaped considerable cost savings by using collective trusts or separate accounts, but Defendants again failed to investigate this option.

121. Unlike mutual funds, which by law must charge the same fee to all investors, separate account fee schedules are subject to negotiation. Industry data shows that actual fee schedules on separate

accounts are typically lower than advertised fee schedules, particularly when the plan or investor has a large amount of assets to invest, as did the Cerner Plan here.  Other than with respect to the American Century Ultra separate account that the Cerner Plan began using on or around April 2019 at 0.38% in lieu of the much expensive mutual fund version (0.78%) that the Cerner Plan had been using, Defendants do not appear to have successfully utilized the Cerner Plan's assets to substantially reduce fees by moving assets from mutual funds to lower-cost institutional vehicles like collective investment funds or separate accounts.  Moreover, given that the over $100 million of participant's funds were invested in American Century Ultra during the Class Period, it appears that the fiduciaries should have taken action sooner as many institutional minimums are well below that figure.

122.    In addition, Defendants also failed to consider cheaper alternative investment options that were very similar to or in the same "investment style" as those being offered in the Cerner Plan. For example, the chart below compares the expense ratios of various Cerner Plan investment options (identified in bold in the chart below) to far less expensive and well-performing comparable investment options. A reasonable investigation would have revealed the existence of these similar, but lower-cost alternatives. The chart below uses the most recent data available from a commercially available analysis tool as a methodology to demonstrate how much more expensive the Cerner Plan's funds were than substantially similar alternative fund counterparts:

| In Cerner Plan/Low Fee Alternatives with Similarity Score > 0.90 | Fund | Expense Ratio | % In-Plan Fee Exceeds Listed Alternative Fee | Returns (Periods ending March 31, 2020) | | |
|---|---|---|---|---|---|---|
| | | | | 1Y | 3Y | 5Y |
| In Cerner Plan | TRRHX | 0.63% | | -7.31% | 2.29% | 3.36% |
| | T. Rowe Price Retirement 2025 | | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Low Fee Alternative | LIBKX | 0.10% | 530% | -2.82% | 3.38% | 3.63% |
| | BlackRock LifePath Index 2025 K | | | | | |
| Low Fee Alternative | TLVPX | 0.25% | 152% | -3.26% | 3.43% | 3.80% |
| | TIAA-CREF Lifecycle Index 2025 Premier | | | | | |
| Low Fee Alternative | RFDTX | 0.33% | 91% | -1.95% | 4.00% | 4.49% |
| | American Funds 2025 Trgt Date Retire R6 | | | | | |
| **In Cerner Plan** | **TRRCX** | **0.66%** | | **-8.48%** | **2.23%** | **3.43%** |
| | **T. Rowe Price Retirement 2030** | | | | | |
| Low Fee Alternative | LINKX | 0.10% | 560% | -5.42% | 2.91% | 3.51% |
| | BlackRock LifePath Index 2030 K | | | | | |
| Low Fee Alternative | TLHPX | 0.25% | 164% | -4.75% | 3.30% | 3.89% |
| | TIAA-CREF Lifecycle Index 2030 Premier | | | | | |
| Low Fee Alternative | RFETX | 0.35% | 89% | -3.69% | 4.11% | 4.77% |
| | American Funds 2030 Trgt Date Retire R6 | | | | | |
| Low Fee Alternative | IDXGX | 0.39% | 69% | -5.84% | 2.62% | 3.43% |
| | Voya Index Solution 2030 Port I | | | | | |
| **In Cerner Plan** | **TRRKX** | **0.71%** | | **- 10.99%** | **1.84%** | **3.34%** |
| | **T. Rowe Price Retirement 2045** | | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Low Fee Alternative | TLMPX | 0.25% | 184% | -9.33% | 2.44% | 3.77% |
| | TIAA-CREF Lifecycle Index 2045 Premier | | | | | |
| | | | | | | |
| Low Fee Alternative | RFHTX | 0.38% | 87% | -7.36% | 3.78% | 4.89% |
| | American Funds 2045 Trgt Date Retire R6 | | | | | |
| **In Cerner Plan** | **TRRDX** | **0.70%** | | **-10.27%** | **2.03%** | **3.42%** |
| | **T. Rowe Price Retirement 2040** | | | | | |
| | | | | | | |
| Low Fee Alternative | TLPRX | 0.25% | 180% | -7.76% | 2.86% | 3.93% |
| | TIAA-CREF Lifecycle Index 2040 Premier | | | | | |
| | | | | | | |
| Low Fee Alternative | RFGTX | 0.38% | 84% | -7.16% | 3.77% | 4.81% |
| | American Funds 2040 Trgt Date Retire R6 | | | | | |
| **In Cerner Plan** | **TRRJX** | **0.68%** | | **-9.49%** | **2.10%** | **3.41%** |
| | **T. Rowe Price Retirement 2035** | | | | | |
| | | | | | | |
| Low Fee Alternative | TLYPX | 0.25% | 172% | -6.18% | 3.11% | 3.94% |
| | TIAA-CREF Lifecycle Index 2035 Premier | | | | | |
| | | | | | | |
| Low Fee Alternative | RFFTX | 0.37% | 84% | -6.04% | 3.96% | 4.87% |
| | American Funds 2035 Trgt Date Retire R6 | | | | | |
| **In Cerner Plan** | **TRRMX** | **0.71%** | | **-10.94%** | **1.86%** | **3.35%** |
| | **T. Rowe Price Retirement 2050** | | | | | |
| | | | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Low Fee Alternative | TLLPX | 0.25% | 184% | -9.55% | 2.41% | 3.80% |
| | TIAA-CREF Lifecycle Index 2050 Premier | | | | | |
| | | | | | | |
| Low Fee Alternative | RFITX | 0.39% | 82% | -7.58% | 3.79% | 4.91% |
| | American Funds 2050 Trgt Date Retire R6 | | | | | |
| **In Cerner Plan** | **TRRNX** | **0.72%** | | **-11.08%** | **1.78%** | **3.31%** |
| | **T. Rowe Price Retirement 2055** | | | | | |
| | | | | | | |
| Low Fee Alternative | TTIPX | 0.25% | 188% | -9.80% | 2.36% | 3.83% |
| | TIAA-CREF Lifecycle Index 2055 Premier | | | | | |
| | | | | | | |
| Low Fee Alternative | RFKTX | 0.40% | 80% | -7.54% | 3.80% | 4.91% |
| | American Funds 2055 Trgt Date Retire R6 | | | | | |
| **In Cerner Plan** | **TRRBX** | **0.59%** | | **-5.97%** | **2.38%** | **3.31%** |
| | **T. Rowe Price Retirement 2020** | | | | | |
| | | | | | | |
| Low Fee Alternative | TLWPX | 0.25% | 136% | -1.78% | 3.57% | 3.71% |
| | TIAA-CREF Lifecycle Index 2020 Premier | | | | | |
| | | | | | | |
| Low Fee Alternative | RRCTX | 0.31% | 90% | -1.37% | 3.62% | 4.09% |
| | American Funds 2020 Trgt Date Retire R6 | | | | | |
| | | | | | | |
| Low Fee Alternative | IDXBX | 0.39% | 51% | 1.24% | 4.10% | 3.97% |
| | Voya Index Solution 2020 Port I | | | | | |
| | | | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| **In Cerner Plan** | **TRRLX** | **0.72%** | | **-11.05%** | **1.81%** | **3.30%** |
| | **T. Rowe Price Retirement 2060** | | | | | |
| | | | | | | |
| Low Fee Alternative | TVIPX | 0.25% | 188% | -10.02% | 2.31% | 3.86% |
| | TIAA-CREF Lifecycle Index 2060 Premier | | | | | |
| | | | | | | |
| Low Fee Alternative | RFUTX | 0.41% | 76% | -7.48% | 3.79% | 4.89% |
| | American Funds 2060 Trgt Date Retire R6 | | | | | |
| | | | | | | |
| **In Cerner Plan** | **TRRGX** | **0.56%** | | **-4.73%** | **2.30%** | **3.13%** |
| | **T. Rowe Price Retirement 2015** | | | | | |
| | | | | | | |
| Low Fee Alternative | TLFPX | 0.25% | 124% | -1.00% | 3.53% | 3.53% |
| | TIAA-CREF Lifecycle Index 2015 Premier | | | | | |
| | | | | | | |
| Low Fee Alternative | RFJTX | 0.31% | 81% | -1.42% | 3.16% | 3.70% |
| | American Funds 2015 Trgt Date Retire R6 | | | | | |
| | | | | | | |
| Low Fee Alternative | JSBWX | 0.39% | 44% | 4.81% | 3.83% | 5.27% |
| | JPMorgan SmartRetirement Blend 2015 R5; R5 | | | | | |
| Low Fee Alternative | ISSIX | 0.52% | 8% | 1.87% | 7.34% | 7.96% |
| | Voya Index Solution 2015 Portfolio Class I | | | | | |
| | | | | | | |
| **In Cerner Plan** | **WATFX** | **0.45%** | | **5.95%** | **4.36%** | **3.52%** |
| | **Western Asset Core Bond I** | | | | | |
| | | | | | | |
| Low Fee Alternative | BRACX | 0.01% | 4400% | 6.31% | 4.72% | 3.58% |

| | | | | | | |
|---|---|---|---|---|---|---|
| | BlackRock Allocation Target Shrs Ser C | | | | | |
| | | | | | | |
| Low Fee Alternative | SCOAX | 0.12% | 275% | 8.26% | 4.92% | 3.61% |
| | SEI Core Fixed Income A (SIIT) | | | | | |
| **In Cerner Plan** | **AALRX** | **0.58%** | | **-20.22%** | **-3.4%** | **0.23%*** |
| | **American Beacon Large Cap Value R6** | | | | | |
| | | | | | | |
| Low Fee Alternative | VIVIX | 0.04% | 1350% | -14.79% | 0.42% | 4.03% |
| | Vanguard Value Index I | | | | | |
| Low Fee Alternative | VMVLX | 0.06% | 867% | -12.90% | 1.49% | 4.81% |
| | Vanguard Mega Cap Value Index Instl | | | | | |
| | | | | | | |
| Low Fee Alternative | VRVIX | 0.07% | 729% | -17.19% | -2.21% | 1.83% |
| | Vanguard Russell 1000 Value Index I | | | | | |
| | | | | | | |
| Low Fee Alternative | VSPVX | 0.08% | 625% | -12.27% | -0.01% | 3.38% |
| | Vanguard S&P 500 Value Index Instl | | | | | |
| | | | | | | |
| Low Fee Alternative | FLVEX | 0.39% | 49% | -16.79% | -1.47% | 2.16% |
| | Fidelity Large Cap Value Enhanced Index | | | | | |
| **In Cerner Plan** | **ABTIX** | **0.27%** | | **10.15%** | **4.84%** | **3.14%** |
| | **American Century Government Bond R5** | | | | | |
| | | | | | | |
| Low Fee Alternative | VFIUX | 0.10% | 170% | 11.21% | 5.02% | 3.36% |
| | Vanguard Interm-Term Treasury Adm | | | | | |
| | | | | | | |

| Low Fee Alternative | DFIGX | 0.13% | 108% | 13.54% | 5.95% | 3.91% |
|---|---|---|---|---|---|---|
| | DFA Intermediate Govt Fixed-Income I | | | | | |
| | | | | | | |
| Low Fee Alternative | CUTRX | 0.17% | 59% | 12.85% | 5.58% | 3.40% |
| | Columbia US Treasury Index Inst2 | | | | | |
| | | | | | | |
| Low Fee Alternative | VFITX | 0.20% | 35% | 11.10% | 4.92% | 3.25% |
| | Vanguard Interm-Term Treasury Inv | | | | | |

123.    The Cerner Plan expense ratios were multiples of what they should have been given the bargaining power available to the Cerner Plan fiduciaries.

124.    Defendants' failure to monitor investment options and identify and implement the lowest cost alternatives during the Class Period violated ERISA, violated the Cerner Plan's own Investment Policy Statement (29 U.S.C. § 1104(a)(1)(D)), and cost the Cerner Plan and its participants millions of dollars.

**Defendants Allowed the Cerner Plan to Pay Unreasonable Recordkeeping Fees**

125.    As noted above, under 29 U.S.C. § 1104(a)(1), Defendants must "defray[] reasonable expenses of administering the plan" and act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." In addition, under the Cerner Plan's own Investment Policy Statement, the Administrative Committee has a self-imposed mandate to annually review the administrative costs of the Cerner Plan.

126.    One of the responsibilities of administering the Cerner Plan is to select and retain a recordkeeper, paying only reasonable expenses.

127.     Defendants utilized Fidelity as the recordkeeper throughout the entire Class Period.

128.     Based on the First Amendment to the Cerner Plan's Trust Agreement, it appears that Fidelity was being paid an annual asset-based fee of approximately 8 basis points for its services. However, it was noted that this was paid for "from the fund lineup."   As the required disclosure explains: "Asset-based fees are deducted from an investment option's assets, thereby reducing its investment returns.  Fee levels can vary widely among investment options."  *See* Required Disclosure Information, Cerner Foundations Retirement Cerner Plan (June 10, 2019).

129.     This structure, based on solely on assets, results in Fidelity receiving additional payments as assets increase regardless of the amount of work or fair market value of Fidelity's services to the Cerner Plan.

130.     Based upon review and investigation of the Cerner Plan's 5500 during the Class Period, it appears that the amount paid for recordkeeping each year was as follows:

| Year | Estimated Recordkeeping Fees |
|------|------------------------------|
| 2014 | $1,273,425.50 |
| 2015 | $1,348,031.50 |
| 2016 | $1,427,247.10 |
| 2017 | $1,784,241.60 |
| 2018 | $1,763,937.70 |
| 2019 | Unknown |

131.     These recordkeeping fees were far in excess of the reasonable, market rate during the Class Period.

132.     Recordkeeping fees have been going down, not up, for plans like the Cerner Plan. Based on publicly available data from a survey of plans by NEPC, recordkeeping fees declined throughout the Class Period.

133.     As shown in the chart below, the Cerner Plan's recordkeeping fee structure – which appears to have never once been materially adjusted or changed since October 7, 2007! – facilitated payment of over $1,000,000 in excess fees to Fidelity. Based on a 2017 Fee Survey of 123 defined contribution plans with $138 billion in aggregate assets across 21 recordkeepers (with an average plan size of $1.1 billion in assets and 12,021 participants), a reasonable fee based upon the number of Cerner Plan participants in each year would not be in excess of the following:

| Year | Maximum Reasonable Fee |
|------|------------------------|
| 2014 | $1,066,240.00 |
| 2015 | $1,268,800.00 |
| 2016 | $1,227,324.00 |
| 2017 | $1,376,352.00 |
| 2018 | $1,292,300.00 (estimated) |
| 2019 | Unknown |

134.     Had the Defendant's properly discharged their fiduciary duties in accordance with ERISA and their own Investment Policy Statement, they would have continually monitored Fidelity's recordkeeping fee and negotiated reductions in line with the market.  Instead, the Defendants let Fidelity's paycheck grow unreasonably while the participants saw less investment return than they should have, resulting in damages to the Cerner Plan and its participants in excess of $1 million.

## CLASS ACTION ALLEGATIONS

135.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class defined as: **All participants in the Cerner Plan from April 14, 2014 to the present, with the exception of Defendants, Defendants' beneficiaries, and Defendants' immediate families.**

39

136.    Class certification is appropriate under Fed. R. Civ. P. 23(a) and (b)(1), (b)(2), and/or (b)(3).

137.    The class satisfies the numerosity requirement because it is composed of thousands of persons, in numerous locations. The Cerner Plan had thousands of participants and beneficiaries in every year of the Class Period, all of whom suffered from the limited investment options and excessive and improper fees alleged herein. The number of class members is so large that joinder of all its members is impracticable.

138.    There are questions of law and fact common to the Class and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

- Whether Defendants were fiduciaries responsible for monitoring and making decisions with respect to the investments in the Cerner Plan and services for the Cerner Plan;

- Whether the investment decisions made by Defendants were solely in the interests of Cerner Plan participants and beneficiaries;

- Whether the Cerner Plan suffered losses as a result of Defendants' fiduciary breaches; and

- Whether Defendants' acts proximately caused losses to the Cerner Plan and, if so, the appropriate relief to which Plaintiff, on behalf of the Cerner Plan and the Class, are entitled.

139.    Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff's claims, and the claims of all Class members, arise out of the same conduct, policies and practices of Defendants as alleged herein, and all members of the Class are similarly affected by Defendants' wrongful conduct.

140.    Plaintiff will fairly and adequately represent the Class and have retained counsel competent in the prosecution of ERISA class action litigation. Plaintiff has no interests antagonistic to

those of other members of the Class. Plaintiff is committed to the vigorous prosecution of this action and anticipates no difficulty in the management of this litigation as a class action.

141.    Importantly, upon information and belief, Plaintiff never signed any arbitration agreement with any of the Defendants.

142.    Plaintiff has standing to bring this action on behalf of the Cerner Plan because he is a participant in the Cerner Plan and was injured by Defendants' unlawful conduct. Plaintiff is entitled to receive benefits in the amount of the difference between the value of his account currently, or as of the time the account was distributed, and what his accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

143.    Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

144.    In the alternative, certification under Rule 23(b)(2) is warranted because Defendants acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

145.    In the alternative, certification under Rule 23(b)(3) is appropriate because questions of law or fact common to members of the Class predominate over any questions affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

## CAUSE OF ACTION
## BREACH OF FIDUCIARY DUTIES UNDER ERISA

146.    Plaintiff repeats and realleges each of the allegations set forth in the foregoing  paragraphs as if fully set forth herein.

147.    At all relevant times, Defendants were fiduciaries of the Cerner Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Cerner Plan or disposition of the Cerner Plan's assets.

148.    As explained above, as the fiduciaries in charge of one of the largest retirement plans in the entire country, Defendants breached their fiduciary duties to the Plan and its participants and beneficiaries, and are liable for their breaches and the breaches of their co-fiduciaries under 29 U.S.C. § 1104(a)(1) and 1105(a).

149.    As detailed above, Defendants had fiduciary responsibilities with respect to selecting, monitoring, and removing investment options in the Cerner Plan and minimizing recordkeeping fees.

150.    As detailed above, Defendants caused the Cerner Plan to invest hundreds of millions of dollars in investment options that were not in keeping with their fiduciary responsibilities, and Defendants failed to monitor and minimize the Cerner Plan's recordkeeping costs.

151.    By the conduct and omissions described above, Defendants failed to discharge their duties with respect to the Cerner Plan solely in the interest of the   participants and beneficiaries and for the exclusive purpose of providing benefits to participants   and beneficiaries and defraying reasonable expenses of administering the Cerner Plan, in violation of   29 U.S.C. § 1104(a)(1)(A).

152.    By the conduct and omissions described above, Defendants failed to discharge their duties with respect  to the Cerner Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims, in violation of 29 U.S.C. § 1104(a)(1)(B).

153.     By the conduct and omissions described above, Defendants failed to discharge their duties with respect to the Cerner Plan in a manner that diversified the investments of the plan so as to minimize the risk of large losses, in violation of 29 U.S.C. § 1104(a)(1)(C).

154.     By the conduct and omissions described above, Defendants failed to discharge their duties with respect to the Cerner Plan in accordance with the documents and instruments governing the Cerner Plan, namely the Cerner Plan's own Investment Policy Statement, in violation of 29 U.S.C. § 1104(a)(1)(D).

155.     Each Defendant knowingly participated in each violation by the other Defendants, knowing that such acts were a violation, enabled the other Defendants to commit violations by failing to lawfully discharge such Defendant's own duties, and knew of the violations by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy those violations. Accordingly, each Defendant is also liable for the violations by its co-fiduciaries under 29 U.S.C. § 1105(a).

156.     The Compensation Committee Defendants had a duty to monitor the Administrative Committee Defendants to ensure that the Administrative Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Cerner Plan in the event that the Administrative Committee Defendants were not fulfilling those duties. The Compensation Committee Defendants had a duty to ensure that the Administrative Committee Defendants possessed the needed qualifications and experience to carry out their duties (or used qualified advisors and service providers to fulfill their duties), had adequate financial resources and information, maintained adequate records of the information on which they based their decisions and analysis with respect to the Cerner Plan's investments, and reported regularly to Cerner and the Compensation Committee Defendants. The Compensation Committee Defendants failed to fulfill this duty. They failed

to monitor and evaluate the performance of the Administrative Committee Defendants and the processes by which Cerner Plan investment options and recordkeeping expenses were evaluated (if at all) by the Administrative Committee.

157.     As a direct and proximate result of these breaches of fiduciary duties, the Cerner Plan and its participants have paid substantial excess investment management, recordkeeping, and other fund-related fees during the Class Period, and suffered lost-opportunity costs which continue to accrue, for which Defendants are jointly and severally liable pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502(a)(2), 29 U.S.C § 1132(a)(2). The Cerner Plan and its participants suffered millions of dollars of losses due to these excessive costs and lower net investment returns.

158.     If Defendants had complied with their fiduciary obligations, then the Cerner Plan would not have suffered these losses, and Cerner Plan participants would have more money available to them for their retirement.

159.     Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants are liable to restore to the Cerner Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiff is entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

## **PRAYER FOR RELIEF**

160.     WHEREFORE, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.     A determination that this action may proceed as a class action under Rule 23(b)(1) or, in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.     Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

C.      A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.      An Order compelling the Defendants to make good to the Cerner Plan all losses to the Cerner Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Cerner Plan resulting from imprudent investment of the Cerner Plan's assets, and to restore to the Cerner Plan all profits the Defendants made through use of the Cerner Plan's assets, and to restore to the Cerner Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.      An order requiring Cerner to disgorge all profits received from, or in respect of, the Cerner Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against Cerner as necessary to effectuate said relief, and to prevent Cerner's unjust enrichment;

F.      Actual damages in the amount of any losses the Cerner Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Cerner Plan and removal of Cerner Plan fiduciaries deemed to have breached their fiduciary duties;

I.      An award of pre-judgment interest;

J.      An award of costs pursuant to 29 U.S.C. § 1132(g);

K.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the

common fund doctrine; and

L.      Such other and further relief as the Court deems equitable and just.


Dated: April 14, 2020


Respectfully submitted,

FOULSTON SIEFKIN LLP

By: */s/ Scott C. Nehrbass*
     Scott C. Nehrbass, KS #16285
32 Corporate Woods, Suite 600
9225 Indian Creek Parkway
Overland Park, KS  66210-2000
(913) 253-2144
(866) 347-1472 FAX
Email:  snehrbass@foulston.com

Boyd A. Byers, #16253
Alexandra N.C. Rose, #27247
FOULSTON SIEFKIN LLP
1551 N. Waterfront Parkway, Suite 100
Wichita, Kansas 67206-4466
Phone: 316.267.6371
Fax: 316.267.6345
bbyers@foulston.com
nrose@foulston.com

ATTORNEYS FOR PLAINTIFF